Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 1056 | **DATE** | 7/12/2001 |
| **CASE TITLE** | STENDER vs. PROVIDENT LIFE AND ACCIDENT INSURANCE CO | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Pursuant to Memorandum Opinion and Order entered this day, summary judgment is granted. Enter summary judgment in favor of plaintiff and against defendant in the amount of $25,000.00 for attorney fees pursuant to 215 ILCS 5/155. Plaintiff is directed to submit a draft judgment order by August 1, 2001 and shall file his petition for fees pursuant to Local Rule 54.3.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | JUL 17 2001 | 45 |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 7/16/2001 | |
| JS | courtroom deputy's initials | FILED FOR DOCKETING 01 JUL 17 AM 8:10 | date mailed notice |
| | | Date/time received in central Clerk's Office | JS mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| JOEL M. STENDER | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98 C 1056 |
| PROVIDENT LIFE AND ACCIDENT | ) | Judge Ronald A. Guzman |
| INSURANCE COMPANY) | ) | |
| Defendant. | ) | |

**DOCKETED**
**JUL 1 7 2001**

## MEMORANDUM OPINION AND ORDER

The facts of this case were previously discussed in this Court's Memorandum Opinion of June 28, 2000. In that opinion we found that there existed no legitimate dispute as to the fact that the plaintiff, Joel M. Stender ("Stender") is totally disabled relative to the duties he was regularly engaged in as a Pit-Scalper. Subsequently, in March 2001, we ruled on still another motion for summary judgment, this time granting Stender's motion for summary judgment with regard to damages and interest, but denying the same as to Stender's Request for Section 155 damages. We found that Provident has sufficiently raised a material issue of fact as to whether it acted "vexatiously and unreasonably" in handling Stender's claim. Before us now for determination is this final issue. 215 Ill. Comp. Stat. 5/155 provides :

> § 155. Attorney fees. (1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action

1

reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts: (a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs; (b) $25,000; (c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

(2) Where there are several policies insuring the same insured against the same loss whether issued by the same or by different companies, the court may fix the amount of the allowance so that the total attorney fees on account of one loss shall not be increased by reason of the fact that the insured brings separate suits on such policies.

The parties are at odds as to whether or not the analysis of vexatious and unreasonable conduct requires the court to take into consideration the subjective intent and good faith of the insurer, or merely whether or not the conduct was objectively reasonable. There appears to be some conflict in the caselaw. In, *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102 (7th Cir. 2000) the court held:

> Attorney fees may not be awarded against an insurer, under Illinois law, simply because the insurer took an unsuccessful position in litigation, but, rather, only where the evidence shows that the insurer's behavior was willful and without reasonable cause; this means that an insurer's conduct is not "vexatious and unreasonable" if: (1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law.

The requirement that the dispute be "bona fide" implies that there be a good faith belief as to the application of insurance coverage. Thus, a subjective component is part of the evaluation of the

2

insurance company's actions. This conclusion appears to be supported by a number of courts which have found that in making this determination we should consider the totality of the circumstances, including the insurer's attitude. *Marcheschi v. Illinois Farmers Ins. Co.*, 698 N.E.2d 683, (Ill.App.1.Dist.,1998). ( Court deciding whether an insurer is liable for attorney fees and other amounts for vexatiously and unreasonably delaying settlement of a claim should consider the totality of the circumstances, including the insurer's attitude.) *Buais v. Safeway Ins. Co.*, 656 N.E.2d 61, (Ill.App. 1 Dist.,1995). (In deciding whether an insurer is liable, a trial court should consider the totality of the circumstances, including the insurer's attitude.) *Ragan v. Columbia Mut. Ins. Co.*, 684 N.E.2d 1108, (Ill.App. 5 Dist.,1997). (In determining whether a defendant's conduct is vexatiousand or unreasonable, the trier of fact must examine the totality of the circumstances.) *Garcia v. Lovellette*, 639 N.E.2d 935, (Ill.App. 2 Dist.,1994). (Section 155 of the Code provides that a court may award attorney fees and specified penalties in an action against an insurer when the court determines, in its discretion, that the insurer's delay in settling a claim was unreasonable and vexatious considering the totality of the circumstances.) *Spearman Industries, Inc. v. St. Paul Fire and Marine Ins. Co.*, 138 F.Supp.2d 1088, (N.D.Ill.,2001).(There is no evidence of bad faith, vexatious behavior, or unreasonableness on the part of St. Paul concerning its investigation, litigation, and denial of this claim.) Thus, we look at the totality of the evidence in determining whether or not the dispute set forth as to coverage by Provident was both reasonable, and bona fide in the sense that it was made in good faith.

At the heart of this issue is the definition of Stender's occupation. If his occupation is deemed to be that of a Commodities Pit-Scalper, then Provident was clearly without justification

for denying total disability benefits for it has never been doubted that Stender is no longer able to work or perform as a Commodities Pit-Scalper. On the other hand, if Stender's occupation is defined as merely a Commodities Trader, then Provident was justified in denying the benefits. We have already determined by our prior opinions that Stender's occupation was that of a Commodities Pit-Scalper. What remains to be determined is whether or not Provident's attempt to define his occupation as merely that of a Commodities Trader was unreasonable and vexatious.

Stender described his duties as a Commodities Pit-Scalper, as first of all, requiring a membership on a commodities exchange in order to have access to a commodities pit. In the pit his duties consisted of trading many times a day for small increments in value based upon the many tiny changes and fluctuations in price during the course of any trading day. In order to be able to effectuate trades it is necessary to stand in the pit and to be able to shout sufficiently loud enough to make you voice heard over the loud noise of the many other scalpers who also are at the same time attempting to do the same thing. The ability to be able to hear and distinguish offers and acceptances being shouted in the same raucous environment and the ability to attract attention and make yourself heard and understood at precisely the right time so as to effectuate a trade that would take advantage of the constant price fluctuations is crucial. Pit Scalping is a very physical occupation.

Trading commodities off of the floor or pit is entirely different. First, there is no need for access to the pit and therefore membership on a commodities exchange is not necessary. Second, the entire strategy of trading is different. Because trades cannot be made quickly at a precise moment in time it is not possible to take advantage of the hundreds of small fluctuations in

4

changes in price during the course of any given day. Rather, the off the floor trader uses fewer and much slower transactions in an attempt to take advantage of the longer-term direction of the market during a particular time span. Mr. Stender, while a very successful Pit-Scalper, was never able to make a profit as an off the floor commodities trader.

Provident Life and Accident Insurance Company ("Provident") issued plaintiff an occupational disability insurance policy in June of 1980. Stender applied for an additional policy, with the birth of his second child, on October 14, 1982, and the policy was issued on January 14, 1983. Stender testified that his motivation for purchasing these policies was advice given by the president of his clearing firm to all of the younger pit-scalpers at the firm. Apparently, the president was sufficiently experienced to know that a loss of hearing and voice was a common occupational hazard and counseled the younger pit-scalper's to protect themselves against this hazard by purchasing occupational disability insurance. According to Stender all of the pit-scalpers at the firm acted together on this advice to protect themselves from the potential loss of hearing and voice. It is clear that, that the protection sought was protection from the inability to continue performing the very physical work of a Commodities Pit-Scalper. The intent was not to obtain protection from the inability to continue working as an off the floor commodities trader. Off the floor traders are not exposed to the same dangers of loss of hearing and voice as are pit-scalpers because off the floor traders do not need to utilize their voices and hearing capacities in the same way as pit-scalpers. Logically, if the essential duties and skills of pit-scalping and off the floor trading were the same, there would be no need for pit-scalpers to insure themselves against loss of hearing and voice. Should they encounter such difficulties they could simply continue on as off the floor traders should they ever encounter difficulties with their

5

hearing or voice capacities.

Over time Stender himself also became aware of the stress and effects of the duties of his occupation on his voice and hearing. On March 14, 1983, Stender wrote his insurance agent a letter describing his understanding of the terms of the policy in an effort to confirm that the policy he was purchasing would cover him if he should ever become unable to trade on the floor. In the letter he stated that his occupation was that of a Commodities Pit-Scalper, and that scalping entails standing in the trading pit and buying and selling commodities for his own account. Stender further stated it was his understanding that if his hearing or voice deteriorated, for any medical reason, to the point where a physician advised him to discontinue Pit-scalping, he would be entitled to full benefits under the polices. Stender further went on to state that if he were to become disabled, he would still trade, albeit outside of the pit. This, he informed Provident, is "entirely different from what I do for the purpose of the disability insurance," and must therefore be considered a different occupation. Stender made the attachment of this letter to his policy a precondition to Provident accepting his premium check. The intent behind this letter was to confirm that the policy insured his occupation as a Commodities Pit-Scalper. Stender could not have made his intent more clear. From this point on Provident must be deemed to have known precisely what Stender believed his occupation was and that he considered the occupation of Commodities Pit-Scalper different from that of an off the floor trader. His intent at the time of entering into the contract with Provident is therefore clearly established.

Provident responded to Stender in two separate letters. In its first letter, dated April 15, 1983, Provident informed Stender that "[i]n the event of suffering total loss of speech, hearing, sight or use of two limbs, regardless of your ability to engage in any occupation, you will be paid

6

your monthly benefits for lifetime. In the event of a residual disability, where you are unable to perform one or more of your usual important business duties, or cannot devote as much time as normal, and suffer an earnings loss of 25% or more, we would pay a proportionate benefit. This applies only if you return to your normal occupation." In its second letter, dated June 10, 1983, Provident acknowledged Stender's statement that his occupation was that of a Commodity Pit-Scalper, but noted that "the policy does not dictate how you must perform the duties of your occupation." Provident informed Stender that in determining disability, the relevant issue would be whether or not his is able to perform the duties of his occupation. Provident informed Stender that although the letter would be kept in his file, the letter did not have any effect on the disability policy. The terms of these policies also provided that, should Stender become totally disabled, his premium payments would be waived during the time Provident would pay his total disability benefits.

Several years after obtaining these policies, Stender's fears came true and he became totally disabled in that he could no longer hear or speak sufficiently to work as a Commodities Pit-Scalper, and has since been under the care of a physician. In July of 1993, Stender filed a claim for total disability with Provident under both policies, and payment of benefits by Provident commenced soon thereafter. At this point, then, Provident must be deemed to have accepted Stender's occupation as that of a Commodities Pit-Scalper. There would be no other reason to pay on the policy. By December of 1993, Stender informed Provident that he was in the process of learning how to be an off the floor commodities trader. In January of 1994, a Provident Field Agent named Warren Diegel met with Stender to discuss Stender's off the floor trading. The payments continued. Again, it Provident must be deemed to have accepted Stender's

7

occupation as that of a Commodities Pit-Scalper. Otherwise, there would be no basis to continue the payments after learning that Stender was now engaged in trading off the floor. Stender's claim file was then assigned to Clayton Smith, another Provident adjuster in 1995. It was then that Mr. Stender's problems with Provident began.

The gist of Provident's position is found in a field request dated 3/23/95 (Plaintiff's Exhibit 18) in which Mr. Smith writes:

> ... claim form and file indicates this former "pit trader" is "working on becoming off floor trader." If he is doing so -- I think he should be considered as working at his occupation. A trader is a trader. Please interview and advise.

Mr. Smith has given no satisfactory explanation for the sudden change in Provident's position with respect to the definition of Stender's occupation. It is clear that as of the date of this request and before any other information came in, Mr. Smith, at least, had determined to effectively, if not officially, alter Stender's occupational definition from "pit trader" to "trader". As far as we can discern, the sole basis for this change in Provident's position, was Mr. Smith's attitude that "a trader is a trader". Clearly there was no rational basis for this redetermination at this point in time. There was no new information upon which such a change in policy could rationally be based. Smith had not interviewed Stender. Nor was he in possession of *any* new information. In fact, his memo of 3/23/95 was his first involvement with the file. All he would have done prior to the memo would have been to review what was already in the file.

Predictably enough, having received his marching orders from the adjuster, Clayton Smith, Warren Deigel, proceeded to re-interview Stender on 6/7/95 and this time concludes that consideration should be given to changing Stender's claim from total disability to residual

8

disability based on his description of the current work he is performing. The problem with this determination is that Stender on 6/7/95 was performing precisely the same work that he was performing in January of 1994 when Deigel interviewed him for the first time. There is no change in the description of what Stender was doing, nor is there any new material information as to what he did prior to the claim. Insofar as we can glean from the testimony and exhibits the only thing that has changed from the time that Stender's claim was honored to this recommendation that the claim be denied is Clayton Smith's decision that Provident should now take the position that "a trader is a trader". Indeed, Stender testified that he informed Deigel that he had not been successful in learning off the floor trading and had been unable to make a net profit at this new occupation for any year. This is in great contrast to his prior substantial success as a Pit Scalper. He also informed Mr. Diegel that buying and selling commodities is merely a generic term for what he does; that although he could buy and sell the same commodities in and out of the commodities pit, he could not scalp them as he did in the commodities pit. It's interesting to note that even Mr. Smith, in his internal memo of June 15, 1995 to Richard Leiderman, describes Stender's occupation as a "Floor Trader". One wonders why, if indeed it is true that "a trader is a trader" Mr. Smith does not simply describes Stender's occupation is that of "Trader". Clearly, if Provident had nothing more upon which to base its sudden turnabout its action would be unreasonable and vexatious because it would be lacking in any factual basis for rejecting the definition of occupation contained in the application for the policy and which it had previously accepted. Provident is not entitled merely to change its mind for no good reason.

Provident, however, places great emphasis on a "Vocational Analysis" which it commissioned from Pembroke Consultants. The report, apparently one of many such reports,

was compiled in three and a half hours at a cost of $275.10 and is dated June 13, 1997. It was commissioned after Smith's determination to challenge Stender's claim. The importance of this report, according to Provident's witnesses, is not so much that it contains new information, for they admit it does not, but that it is an independent source providing clarification. Clarification of what, we're not quite sure. As best we can discern from the testimony this report serves as Provident's reasonable, good faith basis for changing its mind. But, in truth, the report really does state nothing new. In the first sentence of the report it defines its objective as "to clarify the duties required in the occupation of Futures & Options Trader, and to determine if a self-employed Commodities Trader who has a Bilateral Hearing Loss, Dysphonia/Hoarsness (with Deterioration of his vocal cords/chronic scarring) and Chronic Laryngitis would be able to do the essential duties of this occupation." Thus, the report, unfortunately, assumes the crucial question in it's very first sentence when it describes Mr. Stender as a "Futures & Options Trader". Mr. Stender contends that his occupation is that of a Commodities Pit's-Scalper. To be of any great help the report would have to describe its mission as to determine whether and/or to what extent a Commodities Pit-Scalper is a different occupation from that of a Futures & Options Trader. This in turn would depend upon the essential duties and functions of each. As one would expect from such a misguided analysis the report concludes, in essence, that pit-scalping is just one of many ways of trading commodities. It states:

> Terms such as Futures/Commodities Trader and Market Maker are very broad, and cover various positions within the industry. Thus if Mr. Stender was insured under any one of these occupational titles he would not be totally disabled from his own occupation, if on the other hand he had a specialty definition restricted to trading on the floor of the exchange then he should be classified his totally disabled from his own occupation.

10

In other words, if you define his occupation to be that of a trader, then he is not totally disabled. But if you define his occupation as being that of a Pit-Scalper, then he is totally disabled. This conclusion is not surprising when one considers that the original premise of the report assumed the critical issue to be resolved. More surprising is the use of the term "specialty definition" in the report itself. We find this use puzzling because the term has nothing to do with the definition of the occupation or the vocation, but rather is a term used by Provident to define coverage parameters. Why a truly independent vocational expert would use such a term is puzzling. Moreover, the use of this term, "specialty definition", is nothing more than a red herring. The real question is not whether one labels the essential duties and functions of Stender's occupation as a "specialty definition". Once that is done, the determination has already been made that the policy never intended to cover the precise activities his employment necessarily entailed. The true issue before us is whether or not the policy did, in fact, so intend. But, as we have previously held, it is clear that the policy language gave Mr. Stender the right to expect that his occupation, for purposes of the policy, would be defined by his essential duties. His essential duties were, at the time the policies were initiated, and at all times since then the same. They involved the very physical activity of scalping commodities on the floor of the pit. That fact that Provident agreed to accept his premiums for years and to honor his claim initially and did so for a substantial period of time is proof certain that it accepted this definition for purposes of the policy.

This determination was no doubt made on the basis of all of the information and documentation which Provident possessed at the time of the claim. That information included

11

plaintiff's exhibit 4, the Application for Disability Insurance dated October 11, 1982. In this application, part 3 thereof, Mr. Stender describes his occupation as "commodity floor scalper". His exact duties as "remaining in trading pit most of trading session continuously buying and selling for own account". He describes the "Nature of business" as "commodity futures trading". He clearly differentiates here between what Provident now chooses to call his occupation, i.e., commodities trader, which he describes in the application as the business he is in, and his actual occupation for purposes of the policy, i.e., commodity floor-scalper. The application itself (Exhibit 3), makes this distinction between plaintiff's "business" and his "occupation" when it requires him to describe both. While the policy states that it is issued in consideration of the payment of premiums and of "your statements and representations in the application. A copy of your application is attached and made a part of the policy." Provident itself agreed to and accepted this definitional difference as witnessed not only by the policy and application, but also by the many references to Mr. Stender as a "commodity pit scalper" during the processing of his claim. See plaintiff's exhibits 10, 12, 13, 14, & 15. It is clear from the evidence that at the time the contract was entered into it was the intent of the parties that Mr. Stender's occupational definition for purposes of the policy was that of a commodity pit-scalper. This was true at the time the policy was purchased; it was true when Provident agreed to honor his claim; it was true when Mr. Smith first determined for no reason whatsoever to dishonor that same claim; as it was before, during, and after the expert report commissioned by Provident. Nothing has changed - except, of course, Provident's position. But a change in position without any factual basis is a paradigm example of a vexatious and unreasonable act. All Provident has done is attempt to erase a distinction which it agreed to at the inception of the contract with Stender. In so doing

12

Provident claims this is a new consideration brought to light for the first time by the "Vocational Analysis". We are not convinced. Plaintiff's evidence establishes clearly that the distinction between the business of purchasing commodities and Stender's occupation of pit-scalping was present and considered by Provident both at the time the contract was entered into and at the time his initial claim was granted. Since then, nothing has changed. We find Provident's refusal to honor this claim vexatious and unreasonable under 215 Ill. Comp. Stat. 5/155.

Stender's motion for summary judgment was previously granted with respect to the following:

1) Benefits accrued but not yet paid under the insurance policies;

2) Prejudgment interest on the delinquent benefits at 5 percent; and

3) Reimbursement for all premiums paid by Stender since the date his first disability claim was honored.

Summary Judgment is now granted as to an award of $25,000 under 215ILCS 5/155, and reasonable attorneys fees.

Stender is to submit a statement for final judgment containing a separate statement of the amount of damages requested for each of categories above and the sum total for the same within 14 days. With respect to attorneys fees, plaintiff is directed to file his petition for fees pursuant to LR 54.3 (Attorney's Fees and Related Non-taxable Expenses forthwith.)

SO ORDERED

ENTERED: 7/12/07

HON. RONALD A. GUZMAN
United States Judge

13